# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM J. EINHORN, Administrator of THE TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA & VICINITY, <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY LOGISTICS, LLC., AMERICAN HELPER, INC., MARANO TRUCK SALES & SERVICE, INC., MARANO TRUCK LEASING CORP., MARANO NATIONAL TRUCK LEASE CORP., MARANO NATIONAL TRUCK LEASING CORP., MARANO TRUCK LEASING CORP., MARANO NATIONAL TRUCK, INC., DOMINIC C. MARANO, and MARIAN MARANO, <br><br> Defendants. | Civil Action No. 07-cv-4073 |

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STEVENS & LEE, P.C.
Frank C. Sabatino (FS 2422)
Jo Bennett (JB 9519)
John C. Kilgannon (JK 3649)
1415 Marlton Pike East
Suite 506
Cherry Hill, NJ 08034-2210
(856)354-9200
Fax: (856) 354-8111

fcs@stevenslee.com
jck@stevenslee.com

# TABLE OF CONTENTS

                                                       **Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT........................................................................................................................3

    A. The Leasing Operation Based At 2215 E. Westmoreland Street Is "Under Common Control" With the Liberty Controlled Group. ...................................................3

    B. The Leasing Operations at the Westmoreland Street Property Does Constitute a "Trade or Business" Under the Controlled Group Regulations. ......................................7

        1. The Seventh Circuit Cases Cited By the Maranos Are Inconsistent With the Law of the Third Circuit...........................................................................................8

        2. Alternatively, the Seventh Circuit Decision Are Inapposite. ...................................10

III. CONCLUSION ..................................................................................................................14

# TABLE OF AUTHORITIES

**CASES**

*Board of Trustees of New Jersey Welfare Fund v. Centra*,
   983 F.2d 495 (3d Cir. 1992)..................................................................................5

*Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson*,
   238 F.3d 891 .......................................................................................8, 10, 11, 12, 13

*Central States, Southeast and Southwest Areas Pension Fund v. White*,
   258 F.3d 636 (7th Cir. 2001) .............................................................................8, 10, 13

*Connors v. Incoal, Inc.*,
   995 F.2d 245 (D.C. Cir. 1993)..............................................................................7

*DiGiacomo v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*,
   420 F.3d 220 (3d Cir. 2005), *cert. denied*, 126 S.Ct. 1785 (2006).......................9, 10

*Great West Life & Annuity Insurance Company v. Knudson*,
   534 U.S. 220-21 (2002) .........................................................................................9

*Local 478 Trucking and Allied Industries Pension Fund v. Jayne*,
   778 F. Supp. 1289 (D.N.J. 1991) ..........................................................................8

*Mertens v. Hewett Associates*,
   508 U.S. 248 (1993)...............................................................................................9

*Milwaukee Brewery Workers' Pension Fund v. Jos. Schlitz Brewery Co.*,
   513 U.S. 414 (1995)...............................................................................................14

*Solomon v. Klein*,
   770 F.2d 352 (3d Cir. 1985)...................................................................................7

*Western Conference of Teamsters Fund v. LaFrenz*,
   837 F.2d 892 (9th Cir. 1988) .................................................................................3

*Western Conference Teamsters Pension Fund v. H. F. Johnson, Inc.*,
   830 F.2d 1009 (9th Cir. 1987) ...............................................................................14

**STATUTES, RULES & REGULATIONS**

26 C.F.R. § 1.414(c)-3 ..................................................................................................9

26 C.F.R. § 1.414(c)-4(b).............................................................................................9

26 C.F.R. § 1.414(c)–4(b)(5) .......................................................................................3

26 C.F.R. § 1.414(c)-4(b)(5)(i) ...................................................................................................3, 4

26 C.F.R. § 1.414(c)-4(b)(5)(ii) ...............................................................................................5, 6, 7

26 C.F.R. § 1.414(c)-4(b)(5)(ii)(A) ................................................................................................4

26 C.F.R. § 1.414(c)-4(b)(5)(ii)(A)-(D) .........................................................................................5

26 C.F.R. § 1.414(c)-4(b)(5)(ii)(B) ................................................................................................5

29 C.F.R. § 1.414(c)-2 ....................................................................................................................9

29 C.F.R. § 1.414(c)-4 ....................................................................................................................9

29 U.S.C. § 1301(b)(1) ...............................................................................................1, 5, 7, 12, 14

29 U.S.C. §§ 1381 *et seq.* ...............................................................................................................1

C.F.R. § 1.414(c)-4(b)(5)(i) ............................................................................................................4

## I. INTRODUCTION

On August 28, 2008, Plaintiff William J. Einhorn, Administrator of the Teamsters Pension Trust Fund of Philadelphia & Vicinity ("Fund"), moved for summary judgment against Defendants Dominic Marano ("Dominic") and Marian Marano ("Marian") (collectively, the "Maranos") on Count IV of the Amended Complaint. The Maranos opposed this motion on the following October 6. Einhorn now submits his reply memorandum in support of the pending motion.

Einhorn originally commenced this litigation against ten (10) Defendants that fell into three (3) categories. The first category consisted of one Defendant, Liberty Logistics, LLC ("Liberty"), which formerly paid contributions to the Fund and ceased operations, thereby incurring withdrawal liability under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.*, a statutory amendment to the Employee Retirement Income Security Act ("ERISA"). Dominic owns a 100% interest in Liberty. T. at 18.[1]

The second category consisted of seven (7) other companies (called the "Liberty Controlled Group") that fall "under common control" with Liberty for purposes of Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1). Einhorn alleged that because the Liberty Controlled Group was "under common control" with Liberty, each Defendant in this category was jointly and severally liable for Liberty's withdrawal liability. The seven (7) members of the Liberty Controlled Group are American Helper, Inc., Marano Truck Sales & Services, Inc., Marano National Truck, Inc., Marano Truck Leasing Corp. ("Marano Leasing"), Marano National Truck Lease Corp., and Marano National Truck Leasing Corp. ("Marano Truck

---

[1] The references to the deposition transcript from Dominic Marano's deposition shall be designated as T. at ___. The transcript was attached as Exhibit C to the Memorandum Of Law In Support Of Plaintiff's Motion For Summary Judgment.

1

Leasing"). On January 2, 2008, a Stipulation And Order Of Consent Judgment was entered against Liberty and American Helper. On February 11, 2008, a default judgment was entered against Marano Truck Sales and Service, Marano National Truck Lease Corp., Marano National Truck Leasing Corp., Marano National Truck, Inc. and Marano Truck Leasing Corp.

The liability of Liberty and the Liberty Controlled Group was established before the filing of the pending motion. On January 2, 2008, the Court by Stipulation and Order of Consent Judgment entered default judgment against Liberty in the amount of $653,250.67. On the following February 11, the Court entered a similar default judgment against each member of the Liberty Controlled Group for $659,953.

The third category of defendants consisted of Dominic and Marian. As Einhorn's moving brief explains at page 9, the claim against the Maranos in Count IV rests on the premise that they own an unincorporated leasing operation based at 2215 E. Westmoreland Street in Philadelphia "that constitutes a 'trade or business' that is 'under common control' with Liberty and the Liberty Controlled Group for purposes of MPPAA." Einhorn's moving brief at page 9 argues that "the business made up of the Maranos' leasing activities is jointly and severally liable for the withdrawal liability" generated by Liberty's withdrawal from the Fund. On that basis, Einhorn's moving brief also contends on page 9 that "Dominic and Marian are personally liable for this withdrawal liability, because the 'trade or business' they own is unincorporated."

Significantly, in opposing Einhorn's motion, the Maranos do not argue that any factual issues exist that would preclude summary judgment. Rather, they raise two separate legal arguments. First, the Maranos maintain that the leasing operation at 2215 E. Westmoreland Street is not "under common control" with Liberty. Second, they contend that this leasing

operation does not constitute a "trade or business" for purposes of MPPAA. This reply memorandum will address each of these issues individually.

## II. ARGUMENT

### A. The Leasing Operation Based At 2215 E. Westmoreland Street Is "Under Common Control" With the Liberty Controlled Group.

Dominic and Marian jointly own the property at 2215 E. Westmoreland Street that is at issue in this case T. at 74. Dominic also owns 100% of Liberty. T. at 18. In his moving brief, Einhorn relies on 26 C.F.R. § 1.414(c)–4(b)(5), one of the regulations promulgated by the Internal Revenue Service ("IRS") that governs withdrawal liability. This provision states that, "[A]n individual shall be considered to own an interest owned, directly or indirectly, by or for his or her spouse." Einhorn further argues that because Dominic and Marian are married, the foregoing provision renders Marian a co-owner of Dominic's interests in the Liberty Controlled Group and, thus, part of the controlled group. *See Western Conference of Teamsters Fund v. LaFrenz*, 837 F.2d 892, 893-94 (9th Cir. 1988).

In response, the Maranos place exclusive reliance on another IRS regulation; specifically, 26 C.F.R. § 1.414(c)-4(b)(5)(i), which states:

> (ii) Exception. An individual shall not be considered to own an interest in an organization owned, directly or indirectly, by or for his or her spouse on any day of a taxable year of such organization, provided that each of the following conditions are satisfied with respect to such taxable year:
>
> (A) Such individual does not, at any time during such taxable year, own directly any interest in such organization;
>
> (B) Such individual is not a member of the board of directors, a fiduciary, or an employee of such organization and does not participate in the management of such organization at any time during such taxable year;

3

> > (C) Not more than 50 percent of such organization's gross income for such taxable year was derived from royalties, rents, dividends, interest, and annuities; and
>
> > (D) Such interest in such organization is not, at any time during such taxable year, subject to conditions which substantially restrict or limit the spouse's right to dispose of such interests which run in favor of the individual or the individual's children who have not attained the age of 21 years. The principles of § 1.414(c)-3(d)(6)(i) shall apply in determining whether a condition is a condition described in the preceding sentence.

According to the Maranos, Marian does not satisfy any of the requirements that would make her part of the controlled group. On this basis, they dispute the suggestion that the Westmoreland Street leasing operation falls under common control with Liberty.

As a threshold matter, the limited nature of this argument should be placed in the proper perspective. If successful, this theory based on 26 C.F.R. § 1.414(c)-4(b)(5)(i) would remove Marian from the putative controlled group that consists of Liberty, the Liberty Controlled Group, and the leasing operation at 2215 E. Westmoreland Street. However, this contention *would not* defeat the entire controlled group claim at issue in the pending motion. To the contrary, Dominic's 100% ownership in Liberty and the Liberty Controlled Group combined with his 100% undivided interest in the property at 2215 E. Westmoreland Street would suffice to sustain a controlled group theory that would render Dominic personally liable for the withdrawal liability.

Even if the interests that Dominic and Marian hold in the Westmoreland Street property and leasing operation were considered separate, because the couple is married, Dominic would be "considered to own" Marian's interest by operation of 26 C.F.R. § 1.414(c)-4(b)(5)(i). Dominic also could not rely on the defense in 26 C.F.R. § 1.414(c)-4(b)(5)(i) that Marian claims in this motion. The first subdivision of that regulation, 26 C.F.R. § 1.414(c)-4(b)(5)(ii)(A), renders the defense inapplicable to an individual with respect to any entity in which that

4

individual "directly [owns] any interest."  As Dominic clearly has a direct ownership interest in the Westmoreland Street property and leasing operation, he also owns Marion's interest in by operation of C.F.R. § 1.414(c)-4(b)(5)(i) and, thus, forms the nexus of the controlled group that encompasses Liberty, the Liberty Controlled Group, and the Westmoreland Street leasing operation.

In addition, this argument fails even with respect to Marian.  By its plain terms, 26 C.F.R. § 1.414(c)-4(b)(5)(ii) will *not* preclude an individual from "being considered to own an interest in an organization owned, directly or indirectly, by or for his spouse," unless all four (4) of the criteria in 26 C.F.R. § 1.414(c)-4(b)(5)(ii)(A)-(D) are satisfied.  According to one (1) of these criteria, codified in 26 C.F.R. § 1.414(c)-4(b)(5)(ii)(B), an individual may not qualify for protection under this regulation with respect to any organization in which the individual "participate[s] in the management."  The Maranos contend that Marian deserves the shield of 26 C.F.R. § 1.414(c)-4(b)(5)(ii), in part because she has no managerial role in Liberty.

The fallacy of this argument lies in the attempt to limit the analysis to Marian's connections *with Liberty*.  Rather, the Court should consider Marian's relationship not only with Liberty but also with *the entire Liberty Controlled Group*.  The plain language of the governing statute compels this expanded analysis.

As Einhorn has emphasized throughout this litigation, Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), unequivocally states that "employees of all trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such businesses *as a single employer*" (emphasis added).  In other words, Liberty and all seven (7) members of the Liberty Controlled Group constitute the same "single employer" and, thus, are jointly and severally responsible for each other's withdrawal liability.

5

*Board of Trustees of New Jersey Welfare Fund v. Centra*, 983 F.2d 495, 503 (3d Cir. 1992). Precisely for that reason, this Court has entered default judgments against each of these eight (8) companies for the liability generated by Liberty's withdrawal from the Fund.

ERISA's mandate that all trades or businesses under common control constitute a "single employer" prevents the Court from looking only to Marian's connections with Liberty in considering the applicability of 26 C.F.R. § 1.414(c)-4(b)(5)(ii). Because Liberty and the Liberty Controlled Group collectively make up "a single employer," the focus should be on all entities. If any of these entities falls within a controlled group with the leasing operation maintained at 2215 E. Westmoreland Street, then all entities must be treated as the same "single employer" that is "under common control" with that leasing operation.

The record, moreover, belies any suggestion that Marian played no role in the management of the Liberty Controlled Group. At his deposition, Dominic testified that Marian served as the Secretary of Marano Leasing and Marano Truck Leasing, two members of the Liberty Controlled Group. T. at 76, 80-82. The attached filing downloaded from the Pennsylvania Department of State's website, attached hereto as Exhibit "A," demonstrates that Marian held the positions of both Secretary and Treasurer of Marano Truck Leasing. A similar document from the Pennsylvania Department of State concerns Marano Truck Sales & Service, Inc., another member of the Liberty Controlled Group against which the Court has entered default judgment identifies Marian as the Treasurer is attached hereto as Exhibit "B".

Indeed, Exhibit B is most illuminating. This filing, downloaded from the Pennsylvania Department of State's website on October 9, 2008, states that the corporation is still "Active." Furthermore, the corporation maintains its address at 2215 E. Westmoreland Street in Philadelphia, the very property involved in the leasing operation. This fact graphically

6

demonstrates that permitting the leasing operation at Westmoreland Street to escape controlled group liability would truly permit the Maranos to escape withdrawal liability by "fractionalizing" the assets of their business operations.

In any event, Pennsylvania law specifically obligates each corporation to have, *inter alia*, a Secretary and a Treasurer. 15 Pa. C.S.A. § 1732(a). The entire purpose of these positions is to perform "duties in the management of the corporation." 15 Pa. C.S.A. §1532(b). Indeed, the Third Circuit has found the fact that corporate officers do not perform management functions to constitute evidence that the corporate form should be set aside as a sham. *Solomon v. Klein*, 770 F.2d 352, 354 (3d Cir. 1985) (finding that the "nonfunctioning" of corporate officers is among the reasons for piercing the corporate veil). In short, the Maranos cannot escape liability under 29 C.F.R. § 1.414(c)-4(b)(5)(ii).

**B. The Leasing Operations at the Westmoreland Street Property Does Constitute a "Trade or Business" Under the Controlled Group Regulations.**

Einhorn's moving brief cites numerous cases for the proposition that the leasing of real estate: (1) constitutes a "trade or business" for purposes of controlled group liability, and (2) leads to personal liability of the owners if the leasing operation that incurs controlled group liability and is not incorporated. The Maranos attempt to distinguish the bulk of these opinions in footnote 4 on page 8 of their brief. According to the Maranos, the cases cited by the Fund "involved businesses or operations that leased property to the withdrawing employer."

The above-quoted footnote does not support the Maranos for two (2) separate reasons. First, as discussed below, during the relevant time period Dominic and Marian did lease the Westmoreland Street property to members of the Liberty Controlled Group, entities that, pursuant to Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), constitute a "single employer" with Liberty. Hence, the Maranos effectively leased the property in question to the withdrawing

7

employer. Second, the Maranos never respond to the authority cited in Einhorn's moving brief which holds two or more entities need not share such a business relationship in order to be "under common control" as long as they have sufficient common ownership. *Connors v. Incoal, Inc.*, 995 F.2d 245, 249-50 (D.C. Cir. 1993). Indeed, footnote 4 of the Maranos' brief admits that *only* one (1) of the two (2) entities found liable under the operative controlled group regulations in *Local 478 Trucking and Allied Industries Pension Fund v. Jayne*, 778 F. Supp. 1289, 1296, 1305 (D.N.J. 1991) leased real estate to the withdrawing employer. Hence, footnote 4 of the Maranos' brief does not distinguish the cases discussed therein on any managerial basis.

The Maranos make one other attempt to define the leasing operations located at Westmoreland Street as other than a "trade or business." Specifically, they characterize the leasing operation as a "passive investment" that falls outside the ambit of controlled group liability. The Maranos base this contention on two cases from the Seventh Circuit. *Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson*, 238 F.3d 891 (7th Cir. *Cert. denied*, 534 U.S. 821 (2001), and *Central States, Southeast and Southwest Areas Pension Fund v. White*, 258 F.3d 636 (7th Cir. 2001). Initially, these opinions do not comport with the law of the Third Circuit. Alternatively, the Seventh Circuit decisions are distinguishable.

1. **The Seventh Circuit Cases Cited By the Maranos Are Inconsistent With the Law of the Third Circuit.**

As quoted on page 12 of Einhorn's moving brief, in Section 4001(b)(1) of ERISA, Congress required that the ground rules for determining joint and several liability under MPPAA "be consistent and coextensive with the regulations prescribed for similar purposes by the Secretary of the Treasury under Section 414(c) of Title 26." In effect, Congress specifically chose the IRS controlled group regulations to govern controlled group liability under MPPAA.

8

Because Congress selected these regulations, these regulations should be interpreted in the same way as ERISA. This point is dispositive.

The IRS regulations set forth very detailed rules for determining controlled group liability. These rules include the definitions of parent-subsidiary group controlled liability, brother-sister controlled group liability (which is involved in this case), and combined controlled group liability). 29 C.F.R. § 1.414(c)-2. Other provisions govern the "Exclusion of certain interests or stock in determining control." 26 C.F.R. § 1.414(c)-3. The regulations also include "Rules for determining ownership," which, in turn, cover both the constructive ownership of proprietary interests, attribution from various types of business entities, and the extent to which family members are deemed to own each others' interests in a putative control group. 29 C.F.R. § 1.414(c)-4. There are even rules for determining whether a person holding an "option" to acquire stock actually "owns" that stock. 26 C.F.R. § 1.414(c)-4(b). Yet none of these regulations, which extend for pages, even vaguely suggests that a defense exists if a defendant can demonstrate that his or her ownership interest involves a "passive investment."

In effect, the Seventh Circuit cases cited by the Maranos construct a defense that has no textual basis in the operative regulations. Significantly, the Supreme Court has repeatedly admonished that ERISA is a "comprehensive and reticulated" statute that does not support causes of action that do not appear in the language of the statute. *Mertens v. Hewett Associates*, 508 U.S. 248, 251 (1993). See *also Great West Life & Annuity Insurance Company v. Knudson*, 534 U.S. 220-21 (2002). Significantly, the Third Circuit has adopted this principle in the context of defenses.

*DiGiacomo v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 420 F.3d 220 (3d Cir. 2005), *cert. denied*, 126 S.Ct. 1785 (2006) concerned the calculation of the

9

benefits due a retiring participant. This Fund asserted defenses in the calculation of this benefit that did not appear in the text of the statute but which, the Fund argued, served the policies underlying the statute. The Third Circuit recognized that "sound policy reasons" might exist for the position taken by the Fund. Nonetheless, the Third Circuit found that the absence of a textual basis for the defense defeated the Fund's position, regardless of the policy arguments behind that position. In the words of the *DiGiacomo* court:

> s*uch reasons do not, in our view, overcome the plain language of the statute*. Change in legislation is a task for Congress, and of our interpretation of what Congress has said so plainly is now disfavored, it is for Congress to cure. We do not sit here as a policy-making or legislative body.

*Id.* at 228 (emphasis added).

This case falls within the logic of *DiGiacomo*. Congress chose the governing IRS regulations to define withdrawal liability. As stated above, nothing in those regulations recognizes a defense because the defendant was engaged in a "passive investment." As in *DiGiacomo*, this case involves an effort by the Maranos to read a defense into the text of the operative statutory scheme that simply does not exist. Because Congress selected the IRS regulations, which include no such "passive investment defense," this Court cannot recognize such a defense. As in *DiGiacomo*, the Court should enforce the governing text as written and reject the defense which has no basis in that text.

**2. Alternatively, the Seventh Circuit Decision Are Inapposite.**

Even assuming that the Third Circuit would accept the holdings of *Fulkerson* and *White*, the facts of those decisions are fundamentally different than those of this case. The property leased in *Fulkerson* that allegedly formed the basis of the controlled group was leased subject to "triple net leases" under which the defendant "had few obligations associated with being a traditional landlord." 238 F.3d at 893. In contrast, Section 8.02 of the Lease for the

10

property at 2215 E. Westmoreland Street obligates Dominic and Marion to perform "major repairs of the non-structural elements, of the building." This provision recently required the Maranos to make a $15,000 repair to the roof of the leased building. This obligation, moreover, is open-ended. If the building required repairs continuously throughout the year, the Maranos would have to pay for these repairs. In *Personnel, Inc.*, 974 F.2d 789, 796 (7th Cir. 1992) the Seventh Circuit described a "passive investment" as akin to "stocks or bonds." Any such description of the Westmoreland Street leasing operation is absurd. Hence, the Court should impose control group liability.

Another basis exists for distinguishing *Fulkerson*. In *Fulkerson*, the defendant leasing operation *never* leased property in any entity that owed part of the withdrawal liability at issue in that case. In contrast, *National Pension Plan of UNITE HERE Workers Pension Fund v. Swan Finishing Co., Inc.*, 05 Civ. 6819 SAS (S.D.N.Y. May 16, 2006) (2006 WL 1292780) involved a situation in which a multiemployer pension brought suit against: 1) a withdrawing employer, and 2) a limited liability partnership under common control with the withdrawn employer. The partnership, which leased commercial real estate, attempted to defeat joint and several liability by claiming status as a "passive investment." Significantly, the partnership based this argument on *Fulkerson* and pointed to various aspects of the underlying leasing operation that mirrored the facts of *Fulkerson*. These characteristics included the exclusive use of "triple net leases" and few duties that the partnership owed as landlord. *Swan Finishing* *2.

The *Swan Finishing* court, however, found *Fulkerson* "readily distinguishable." *Swan Finishing* at *4. The court noted that because the partnership in *Swan Finishing* had leased property to the withdrawing employer, the withdrawing employer had made lease payments to the partnership "that otherwise may have been available to pay" the withdrawal liability. *Swan*

11

*Finishing* at *4. The *Swan Finishing* court found the partnership under common control with the withdrawing employer in order to prevent the defendants from escaping withdrawal liability by action to "dissipate or fractionalize" assets of the control group. *Id.*

In an apparent attempt to side-step *Swan Finishing,* the Maranos assert on page 12 of their brief that they "did not lease property to the withdrawing employer." True, the Maranos did not lease property to Liberty, but that distinction carries no weight. The Maranos *did* lease the Westmoreland Street to Marano Leasing and Marano National Leasing, entities that belonged to the Liberty Controlled Group. These entities are, and have been held to be, joint and severally liable for Liberty's withdrawal liability. Also, pursuant to the Section 4001(b)(1) of the ERISA, 29 U.S.C. § 1301(b)(1), these entities form a "single employer" with the Liberty. Thus, under the logic of *Swan Finishing*, *Fulkerson* is "readily distinguishable" from this case.

The Maranos also try to circumvent *Swan Finishing* by arguing that they ceased leasing the Westmoreland Street property three (3) years before Liberty withdrew from the Fund. In *Central States, Southeast & Southwest Areas Pension Fund v. Personnel, Inc.*, *supra,* however, the defendant (named Perelle), had leased property to the withdrawing employer from 1980 until some time in 1985. The employer did not withdraw from the multiemployer pension plan in question until "December 1986." As quoted in Einhorn's moving brief, the Seventh Circuit found "Perelle's leasing activities related" to the withdrawing employer because the withdrawing employer had paid rent to the Perelle for five years. 974.2d at 793-94. Because "Perelle clearly profited from his arrangement with" the withdrawing employer, Perelle's leasing arrangements fell under common control with the employer. *Id.*

The facts of this case are even stronger for liability than those of *Personnel*. The Maranos purchased the Westmoreland Street property on November 30, 1983 (T. at 74). Thus,

12
SL1 871559v1/027202.00051

the property benefitted Liberty and the Liberty Controlled Group, - - as well as the Maranos - - for about fifteen (15) continuing years prior to Liberty's withdrawal. According to *Personnel,* the fact that the leasing relationship ended before the withdrawal does not defeat controlled group liability.

The other Seventh Circuit case cited by the Maranos, *White,* has even less relevance to this case than *Fulkerson*. Indeed, the facts of *White* are unique. The multiemployer pension plan in that case alleged that the unincorporated trade or business under common control with the withdrawing employer consisted of two (2) apartments that the defendants rented. Significantly, these apartments were located above the garage on the property of the defendants' home. 258 F.3d at 637. The Seventh Circuit held that the defendants' renting of these apartments did not constitute a "trade or business" for two reasons. First, the *White* court noted that the defendants' primary purpose for renting the apartments was not "income or profit," but to obtain "the added security [for their home] of the tenants' presence." 258 F.3d at 643. Second, because the apartments "were appendages of their [the defendants] primary residence," the defendants' landlord activities "benefited them personally as [those activities] maintained the value of their home." *Id.* Because the defendants rented and maintained the property for such "personal" reasons, the apartments fell outside the controlled group.

In this case, the Maranos do not reside at 2215 E. Westmoreland Street and any pretense to relying on *White* cannot possibly succeed. In contrast to *White,* the property in question has always been leased "for income and profit." As previously explained, the Maranos originally purchased the property to service the Liberty Controlled Group. Since 2000, a "significant part" of the family's income has come from the leasing arrangement (T. at 140). In short, the narrow holding of *White* has no applicability to this case.

13

## III. CONCLUSION

The issues presented to this Court by the pending motion center on two (2) important policies that motivated Congress to create withdrawal liability. The first policy provides that any employer that withdraws from a Fund must pay withdrawal liability, or that employers' proportionate share of these plans' unfunded vested liability. *Milwaukee Brewery Workers' Pension Fund v. Jos. Schlitz Brewery Co.*, 513 U.S. 414, 417 (1995). The second policy, which underlies controlled group liability, prevents employers from "shirking" withdrawal liability "by fractionalizing operations into many separate entities." *Western Conference Teamsters Pension Fund v. H. F. Johnson, Inc.*, 830 F.2d 1009, 1013 (9th Cir. 1987). *Accord Personnel*, 973 F.2d at 794; *Swan Finishing* at *4.

The facts of this case demonstrate that since 1980 the Maranos have operated several businesses in various aspects of the trucking industry. These businesses have included over-the-road deliveries (Liberty), leasing drivers (American Helper), and leasing trucks (Marano Leasing and Marano National Leasing). During this time, the Maranos' companies (all of which are "under common control") have built up a principal unfunded vested liability owed to the Fund of $406,800. During this time, the Maranos have also made a significant amount of money. For example, they sold their truck leasing business for $1.2 to $1.3 million (T. at 83).

The Maranos do not suggest that Liberty or the Liberty Controlled Group can pay any significant portion of their withdrawal liability. To the contrary, the Maranos propose to walk away and to saddle the Fund with that liability. Yet, the Maranos still benefit from the leasing arrangement at 2215 E. Westmoreland Street. This operation has functioned as an integral part of the Liberty Controlled Group. To permit the Maranos to detach this operation from the Liberty Controlled Group, while jettisoning the underlying withdrawal liability, would make a mockery of the Congressional policy, codified in Section 4001(b)(1) of ERISA, 29

14

U.S.C. § 1301(b)(1), against employers "shirking" withdrawal liability "by fractionalizing operations in many separate entities." To prevent that result, the Court should grant Einhorn summary judgment on Count IV of the Amended Complaint.

>Respectfully submitted,
>
>**STEVENS & LEE**
>
>By */s/ John C. Kilgannon*
>    Frank C. Sabatino
>    fcs@stevenslee.com
>    Jo Bennett
>    jb@stevenslee.com
>    John C. Kilgannon
>    jck@stevenslee.com
>    1818 Market Street, 29th Floor
>    Philadelphia, Pennsylvania 19103
>    (215) 751-2883
>
>Attorneys for Plaintiffs

Dated: October 13, 2008